The ADA permits former employees in Lt. Stanley's shoes to challenge discrimination in post-employment benefits. There are at least two paths to that conclusion here. First, the narrow path is to recognize that former employees may sue when they allege that they were discriminated against as qualified individuals while still employed. After she was diagnosed with Parkinson's in 2016 and before she retired as a firefighter in 2018, Lt. Stanley was indisputably a qualified individual. During that period, she was subject to a policy that she alleges reduced her compensation in a discriminatory manner. Under the ADA, former employees may challenge such discrimination even if they are no longer employed by the time they bring suit. If the court adopts this rationale, it should make clear that it is not foreclosing the possibility that an employee may also challenge discrimination that, unlike here, occurs entirely after their last day on the job. Second, if the court chooses to resolve this case on a broader rationale, it should hold that former employees may challenge post-employment discrimination. Read in context as the City rightly concedes it must be, the qualified individual definition ensures that employers can make necessary job-related decisions. But it doesn't license discrimination unrelated to job performance or impose a temporal limitation on the ADA's protections. Congress made a choice to prohibit discrimination in post-employment benefits, benefits that are crucial to recruiting people to take on dangerous jobs like firefighting and policing. Yet under the City's reading, the ADA's protections for these benefits mean the least precisely when they matter most. Congress did not enact such a self-defeating scheme. I welcome the Court's questions. Did the courts below decide your first point? The 11th Circuit discussed this argument but did not reach it. The 11th Circuit erroneously, in our view, believed that the argument hadn't been properly presented because it appeared in an amicus brief by the United States. But that brief by the United States was filed two days before Lieutenant Stanley filed her opening brief, and her opening brief fully incorporated that argument. In fact, the first page of the brief was a statement of adopting the government's arguments, and then Lieutenant Stanley referred to that in her summary of argument and argument, and it was a focus of the oral argument below. Do courts normally adopt the positions of amicus to fill in gaps in the parties' briefs? No, I think, well, I think in the lower courts at least, as we just saw, in this court sometimes an amicus does play that role. But in the lower courts, conventionally, no. The 11th Circuit was applying a rule that simply because something is presented in an amicus brief doesn't mean the court has to reach it. But this is a different scenario, as I just described, because the amicus brief was filed first, the position was fully adopted in the opening brief, and it was discussed at oral argument. So I think under this court's formulation of pressed or passed below, it was pressed and it is available to this court to reach. When you sought cert here, did you make that argument, or did you simply point out the split between the circuits as to whether former employees can bring an action under the ADA? Your Honor, this issue was ventilated in the cert papers. I think if you look at the brief in opposition at page 30 through 31, there's an extensive discussion of this. We discussed it at pages 24 through 25 of the petition and also in the certiorari reply at page 9. So I think we understood the court in granting the case including that argument, and it is an answer to the question presented that would resolve at least part of the circuit split below. Counsel, isn't this a different scenario as well? You said this was a different scenario in terms of the Eleventh Circuit's waiver argument because we're talking about fundamentally a motion to dismiss and whether or not Ms. Stanley plausibly alleged discrimination. And so I guess I'm a little confused by the Eleventh Circuit's waiver analysis in that context. I don't know what they mean that she waived her ability to make this argument by not raising it before the district court because the district court's task was just to determine whether or not she had plausibly alleged facts that would support a theory of discrimination under the ADA, right? Yeah, and I think that's another way that this court can approach this issue, which you often say, which is that as long as a party has preserved a claim, the party can make legal arguments in support of that claim. And that's true in this court, even when the refinements happen here. But in this case, the legal argument was presented to the Court of Appeals, and so I think it is... And they somehow suggested that it was not available to her in that way because she had not made that particular argument in support of her claim below, right? Yeah, and the rule that they invoked, as I said in my answer to Justice Thomas, was this rule that we don't reach an argument simply because it's in the amicus brief, but I think that doesn't accurately describe what happened here because Lieutenant Stanley was, in fact, pressing the argument. And as I said, it was also fleshed out at the surcharge. So can you speak to the question of the facts here and whether or not she has plausibly alleged discrimination while she was employed? Right. So, of course, complaints plead facts, not law. And so the question is, are the factual ingredients for that complaint, for that argument present in the complaint? And I think they are. And I think... What are those ingredients? I'd first point you to paragraph 16 of the complaint. And there, Lieutenant Stanley alleged that there came a point where she had no choice but to retire while she was employed by the city of Sanford. And she was subject to the policy that's also at paragraph 26. She was subject to this policy. And so the factual ingredients for the argument are there. She was employed by the city. She was able to do her job, but she recognized that she was inevitably going to have to retire because of a disability that had arose. And so all of those factual ingredients for the argument we're presenting here were there. The argument is where... At least whereas here, someone is employed and is a qualified individual indisputably and they are subject to a policy that affects their compensation and that they allege diminishes their compensation, they are discriminated against. And that's not new. In fact, the ADA was mapping onto an understanding from Title VII where suits like that had been brought by employees who were current employees who were suing with respect to post-employment benefits. There were several cases that reached this court involving sex classifications. So you're saying it's not post-employment discrimination just because it concerns benefits that would be given after her employment? Exactly. And I think this court repeatedly had recognized that in the Title VII context before the ADA's enactment. If you look, for example, at the Hishon versus King and Spalding case, the court described this scenario where there are benefits that are paid out after employment ends, but there is still a claim with respect to those benefits while the employment is ongoing. And there were also, as I said, several cases involving pension benefits where that was the fact pattern. Mr. Cooks, I think that all of what you said makes sense. There was a period during her employment when she had a claim for disability discrimination. The period between the onset of her disability and her retirement, at least toward the end of that period, I think it was predictable that she might face this situation after she retired. And so there she was aggrieved, and I think there was a sufficient injury, a sufficient threat of injury, in fact, to give her Article III standing. But that doesn't get you home because she didn't file on that claim within the prescribed time. So what you need is the Lilly Ledbetter Act to save you. And the outcome would depend on how you read the Lilly Ledbetter Act. It could be read as sort of an extension of the statute of limitations, which would allow her to pursue that claim at any point in the future when she is not getting the benefits to which she thinks she's entitled. That's one way to read it. But another way to read it, which does have support in the statutory language, is that the Act does not extend to the statute of limitations. It says that an unlawful employment practice occurs when an individual is affected by application of a discriminatory compensation decision or other practice. So a new claim occurs every time in the future when she doesn't get the benefits that she thinks she's entitled to. And if that is what it means, then don't you run into the same statutory language problem that you have with respect to a change in benefits that occurs after the end of employment? Because if she's bringing a new claim, she has to be an otherwise qualified individual, and it's not that easy to fit her situation at that time into the statutory language. So that's what concerns me about your argument. And could you answer, could you say why that is not fatal to your position? Sure. So I think I have at least three responses. First, my first response is to answer the question without resort to the Fair Pay Act. Imagine the Fair Pay Act hadn't been enacted. Lieutenant Stanley's claim was subject to the 300-day requirement to file the claim, and she filed within 214 days of the retirement. So even if you are just focusing on that period before she retired, in that period, she was indisputably a qualified individual. She was subject to the policy, all the things I said before. And so that would, I think, get you out of this problem that you've come across. Well, that's an interesting response. But I'm also happy to try to take a crack at the question itself, because it may come up in other cases. And I think what the statute says is that the unlawful practice occurs at three points, the adoption when the person is subject to the policy, and then where the effects are felt. And Congress was specifically focused on claims with respect to compensation and amended the ADA to make clear that this applied to the ADA. And so I think that is Congress telling us that at this very kind of situation where somebody is subject to the policy, that the unlawful practice occurs there. Counsel, you say in your brief as part of your argument that if the retirees are not unable to perform, they are able to perform. Yes. You smile. I don't think that follows at all. It's not the most intuitive thing. And I'll admit that when I first read the statute, that wasn't the first thing that jumped out. But I do think, and we have lots of other ways to approach the problem from common usage and grammar and examples that we've given. But I do think if you're just thinking about it in terms of formal logic, those are opposites. And so the idea is if you take a sentence and you negate the sentence. Well, no, I understand the plain language. I just don't think it makes any sense in a situation where most likely because you're in a different factual context, you don't know whether they're able or unable. So you wouldn't choose one or the other. Right. I mean, another way to take a crack at this is just to say that it's a question that's sort of a non sequitur. Because what you have here is a sentence that has an embedded premise, right? Whoever drafted this sentence was not very precisely speaking to the question of do you have to have this position at the time or not. They were sort of assuming that. And it says, you know, can perform the essential functions of the person that such individual holds or desires. And then the question is, do you have to hold or desire the position? And I think the best way grammatically to understand that is that there are present tense verbs. You have to be able to perform the function. But then the rest of the part of the sentence after with the word that and after that is a restrictive clause modifying the position. And so the thing you have to be able to perform is the essential functions of the job that you hold or desire to the extent that you hold or desire a job. OK. Now, I don't think you need to read. It's a bit lax intuitive to think that every retired person who is not seeking a job or holding it is entitled to sue for disability. Particularly, for example, let's give you that while they were employed, they weren't entitled to disability benefits. After they retired, the company started giving it to retirees, to employees and retirees, and then took it away. Your reading would permit them to sue still, correct? Well, I think that suit would fail. I understand the intuition of the question, which is, have we opened some big trap door that expands the reach of the statute in a way that we should be worried about? That's exactly my question. And I will note that the other side hasn't identified that category in order to meet the key, but I can see where that concern comes from. And I think one way to answer the question is to look at the discrimination rule and notice that it still requires that any claim be in regards to employee compensation or the terms, privileges, or conditions of employment. And that's the same language in Title VII. So Title VII makes unlawful an act of discrimination with respect to those same nouns. And we're not concerned in the Title VII context that there's some, you know, trap door that opens up a large category of claims. And the reason why is you don't have a claim of that kind unless there is either a prospective employment relationship or some employment relationship that is the locus of that discrimination. The same thing is true with respect to the ADA. So I don't think our argument opens up some broad category of claims. You still have to have that the discrimination has to concern the terms and conditions or compensation of employment. I have one other question. The SG, I believe, takes the position that an employer discriminates against a retiree as to employment benefits that she earned while she was a qualified individual. Why haven't you adopted that? Well, we do endorse the SG's theory. That's what we meant to do in our reply. And if that wasn't clear, I, you know, endorse the SG's theory. And I think it is an alternative textual pathway that gets you to basically the same result and you can get there. Does that then take us to Justice Alito's question of if the discriminatory effect is felt after retirement, if someone didn't have Parkinson's or a condition before retirement while they were still performing? Would that then lead us to Justice Alito's question? It could. Not in this case for the reasons I was discussing with Justice Alito, but in other cases, yes. And I think there are a number of hypothetical scenarios that I think the court should be concerned about. For example, somebody who runs into a burning building and is instantly rendered unqualified or somebody who develops a disability later. And those cases would be captured by the Solicitor General's alternative theory and also by our Part 2 arguments, but not by the narrow theory. Thank you. Justice Thomas? Justice Alito? I am interested in what the implications of adopting, what the consequences of adopting your argument would be. And this is what I would really appreciate some enlightenment on this because I assume you're familiar with how this has worked out in those circuits that have adopted something like your argument or how it might work out nationwide in the future. In a prior life, I saw a lot of ADA cases and they almost always concern the question of reasonable accommodation. And I'm hard-pressed to see how the reasonable accommodation concept can be applied to retirement benefits. And the facts of this case highlight it. So I know the validity of your theory that there was a violation is not before us. But what would be your, how would a court go about, what is the discrimination here? Is it the disparate treatment between employees who work 25 years and then retire and those who work a shorter period of time and retire on disability? Is that it? Or does it have something to do with the change in the scheme? So let me, there are two questions in there, let me take both of them. So I quite agree that the reasonable accommodation concept is not really going to do much work in this scenario. And one way you know that is if you look at the construction provision, B-5, when it's describing the reasonable accommodation requirement, it actually adds on this language, says qualified individual who is an applicant or employee. And so I think that is how Congress cabined the provision just to applicants or employees. And that makes sense because it doesn't make sense to impose on employers the obligation. Let's see how it could work. So if it's, which is it? Is it the change or is it the current status? I think it's both. It is an ongoing discrimination. Let me, so first of all, I'd just emphasize that neither of the courts below address the actual merits of the discrimination claims. No, I understand that. I'm just trying to understand how this is going to work out if you prevail. So you have a situation where your client says, let's just take the ongoing status. Your client says that I'm being, I'm a victim of discrimination based on disability because I should be treated the same way as somebody who worked 25 years. How is the court supposed to determine whether this distinction between somebody who works 25 years and somebody who works a shorter period and retires based on disability is unlawful? What is the test for determining that? Yeah, I mean, I think it will, it will turn a lot on the claim. Let me try to describe what I think is going on here, which is that before this policy was put into place, the city was treating three groups of people as equally deserving of the subsidy. So people who had completed 25 years of service, people who had completed a combined year, 25 years of service when taking into account military service and other firefighting positions, and then people who retired with a disability. That's the third category. And when faced with a budget shortfall, the city chose to only exclude that third group, people with disabilities, from the subsidy, despite the absence of any evidence that it would ameliorate the shortfall. So the city singled out people with disabilities solely because of their disabilities. And in fact, we know that the city has told a disabled retiree who did have 25 years of service that he still could not have the subsidy because he had, after 25 years, become disabled. So what we would, I think, want the opportunity to do on remand is to show that the city treated Lieutenant Stanley differently because of her disability. If she weren't disabled, she would have made it to 25 years and gotten the subsidy. And if the city didn't single out disabled people, she would have gotten the subsidy. Of course, the city will have the opportunity on remand to show why we're wrong in their view and whether you think the underlying claim is doomed to fail or destined to succeed, but the question presented is the same. And I do think these are difficult claims to succeed on. You've said a lot, and I'm not asking, I'm not talking about the validity of this particular claim. I just don't know how this is going to be approached when you have structured retirement benefits. Distinctions are going to be made. So part of what you said seems to me, seems to be that the city just had irrational bias against people with a disability. That would be one argument that might be made. Another part of what you seem to have said is that they didn't really have an economy, a valid economy rationale by not extending the benefits to people who retire with disability. They really weren't going to save any money. But suppose there's no evidence of bias and presumably they will save some money and they say, look, we need to cut, we needed to cut back. So we cut. This is where we cut back and we have a reason for it. The reason is that we want to reward people who worked for us for twenty five years. How is the court going to approach this kind of issue? Well, because if you take out the reasonable accommodation question, I just don't know how this is going to be, how it's going to be approached by courts in the future. Justice Alito, you mentioned a structured benefit plan and the ability to make sort of actuarial sorts of decisions. And Congress actually did focus on this precise problem when it drafted the ADA and it included a safe harbor provision. That's section one, two, two oh one C. And that immunizes plan sponsors, plan administrators, insurance companies from these kinds of risk based decisions. And in fact, your opinion in the Ford case, your concurring opinion in one of these decisions comprising the circuit split mentioned that safe harbor. And I think that actually to the extent that the amici on the other side are hypothesizing a flood of claims, the reason you haven't seen that in the second and third circuits is because that safe harbor provision takes care of and immunizes defendants from from the large majority of those kinds of claims. Thank you. That's helpful. The other side argues that the ADA is only about bringing workers into the workforce and keeping them there. It seems to me that part of the ADA's goal is to encourage people with disability to go into the workforce. And that includes how much benefits they're going to get, right? Exactly. And to the extent that people with disabilities, whether before they enter the workforce or they retire, if the health insurance plan or the benefit they thought they had isn't there or they're afraid it won't be there, that will be disincentivized them from going into the workforce. Correct? Correct. Now, the other side argues that there are a whole plethora of remedies besides this one, besides the ADA to vindicate retirees' rights. Could you go through them and tell me why you think they're not? Besides the fact that the ADA has different different damages scope, I'm not sure that they would qualify, that retirees would qualify for many of these alternatives that they raise. Is that correct? Yeah, I think that's right. I mean, the other sources of law are not a substitute, and certainly they're not trained directly on discrimination on the basis of disability. So my friends on the other side mentioned contract law. If you just take Florida contract law, which would apply here, there would be no claim. Public employers can change their plans prospectively at any time before the benefits are paid out. And so there's the Florida Supreme Court. So the only thing that permits them or stops them from discriminating against retirees is the ADA, correct? I think the ADA is the principal tool and it is the tool that Congress chose. All right, go to the others. And then the other candidate they mentioned is ERISA. So I'll mention that, you know, first of all, when the ADA was enacted in 1990, there was no possibility that ERISA would reach this scenario. ERISA also doesn't apply to public employers like the one here at all. And under ERISA, private employers can generally terminate or amend retirement plans so the thing is they don't reduce or eliminate accrued benefits. The same thing is under contract law. So the problem here that the ADA is trying to reach is a different one, which is not just a contractual promise. It's the idea that you made. Maybe you could think of it as a less good promise to people who had a protected characteristic. And if an employer did that on the basis of race or religion or sex, of course, there would be a claim. And Congress wanted to have parallel coverage for disability as well. The third they mentioned was the Social Security Act or Medicare Act, but I don't see how those apply. They would not apply at all to just the question of retirees. Thank you, counsel. Justice Gorsuch, Justice Jackson. So is the linchpin of this really just focusing on when the discrimination occurred and you say that there are sufficient facts and it should not have been dismissed because this doesn't necessarily involve just post-employment discrimination? Yeah, I think that's right. I mean, I think there are three points in time that that matter, at least when you have to be able to perform the essential functions, when the discrimination must occur to be actionable, and then when you can sue. And what we're saying is, at least on the facts of this case, where the discrimination, as we've been discussing, did indeed occur when she was able to perform the functions of her job as a firefighter, then the question is when you can sue. And if you answer the question on the narrow ground, what you would be resolving is you'd be saying you can sue even if at the point that you sue, you're no longer in the job. And if you do that, that would be resolving a chunk of the circuit split because the Sixth and the Ninth Circuits have held otherwise, as the Court of Appeals recognized at page 17A of the decision below. Thank you. Thank you, Counsel. Thank you. Mr. Liu? Thank you, Mr. Chief Justice, and may it please the Court. The only question presented is whether Stanley has alleged discrimination against the qualified individual under the ADA. The answer to that question is yes. We agree with Stanley that the most straightforward path to that conclusion lies in the period after she was diagnosed with Parkinson's disease, but before she retired. In that period, Stanley was a qualified individual with a disability, and there's no dispute that if the alleged discrimination occurred while Stanley was both qualified and disabled, the alleged discrimination was against a qualified individual. The court can and should decide this case on that narrow basis, but in doing so, it shouldn't foreclose the possibility of relief in other cases involving plaintiffs who were not both qualified and disabled when the disability discrimination occurred. We believe the ADA also protects the benefits those plaintiffs earned as qualified individuals, but because the alleged discrimination here occurred while Stanley was both qualified and disabled, this court need not address any broader arguments to vacate the decision below. I welcome the court's questions. Where did the petitioner make those arguments in the district court and in the court of appeal? So in the district court, we think this this argument is supported in paragraph 16 of the complaint. That paragraph of the complaint alleges that she became disabled before she retired and also alleges that she continued to work until she retired. We think it's a plausible inference from that paragraph that she was a qualified individual with a disability at some point before she retired. In the court of appeals, I would look at Roman 8 and page 10 of her opening brief, pages 4 to 13 of her reply brief. And I would listen to the first five minutes of the oral argument below in which Stanley herself described the path I'm identifying here as, quote, the narrowest path to a decision in her favor. And then in this court, I would I would cite the same pages my friend said in the petition, particularly pages 7, 11, 24 and 25. I would note that the city argued forfeiture in its brief in opposition. Presumably, this court considered and rejected that forfeiture contention as a basis for denying review and for good reason, because this court has said time and again that once a party has preserved an issue for this court's consideration, that party can make any argument in support of that issue. And the issue here is whether Stanley satisfies the qualified individual requirement. I want to emphasize why we think it's a good idea to decide this case narrowly. First, we think it answers the question presented. Second, we do think it would go a long way to resolving the circuit split that's identified at page 17 of the petition appendix. And the split implicates two decisions from the Sixth Circuit and the Ninth Circuit, the McKnight decision and the Wire decision, which both held that former employees categorically cannot sue to enforce Title One. And so if this court were to hold that at least someone in Stanley circumstances can sue, even though she was a former employee when she brought the suit, that would resolve that question that's divided the circuit. Could she sue if she had not filed within 300 days? I do, Justice Alito. I have the same two responses my friend did. I think it's unnecessary to reach that interpretation of the Fair Pay Act because there are 86 days in the 300 day limitation period that fall during the period after she was diagnosed, but before she was disabled. And those may well be days that support her claim here. But to get to the interpretation of the Fair Pay Act, we understand the Fair Pay Act as saying that you can identify a discriminatory decision that falls outside the limitations period. That is a decision that satisfies all the elements of discrimination under 12.1.12a. And so long as you can point to effects from that decision that do fall within the limitation period, then you can challenge that decision. We understand that to be the force of the Fair Pay Act in a context like this. I don't want to take up too much time, but I am interested in the last questions, the last series of questions I asked Mr. Gupta. So in this case, because I want to understand where this leads, in this case, Lieutenant Stanley is actually treated more favorably than someone who retires after 20 years for a reason other than disability. She is treated less favorably than someone who retires after working for 25 years. So how is a court put aside, there is no question of bias, the employer puts forward information that this is based on cost saving and incentivizing working until 25. What is the test for determining whether something like that is valid or not? The reasonable accommodation concept would work in the employment context, but it doesn't work here. So what's the answer? Yeah, I don't think this is a reasonable accommodation claim. I don't think Stanley has ever brought a reasonable accommodation claim. Okay, it's not a reasonable accommodation. So how do you determine whether this kind of a structure is discriminatory? So we understand this to be a disparate treatment claim and we understand that the right way to go about analyzing a disparate treatment claim is to ask how a similarly situated person without disabilities would be treated. And as you know, the United States hasn't taken a position on this issue, but I understand the parties to have staked out two different ways of identifying the relevant similar situated comparator. I think if you ask a petitioner, what they would say is what you do is you subtract disability from the equation and you see what would have happened then. And in their view, if you subtract disability from the equation, their client, Stanley, would have worked more than 25 years and thus been eligible for benefits until she was 65. Now the city responds and says, well, when you subtract disability from the equation, that's all you subtract out and you hold the terms of service constant at 20 years. They would say that that petitioner is changing two variables, not only the disability, but also the terms of service. And so the city says a similarly situated person with only 20 years of service and no disability wouldn't have gotten benefits in this case. So Stanley should lose. I think that's the form of the disparate treatment analysis that should occur in the courts below. But as my friend pointed out, neither court analyzed the issue. It doesn't affect this court's consideration of the qualified individual issue that is before it. And so it can just be left. Well, I'm sorry. No, go ahead. It affects at least my thinking because I want to know where we're going with this. Right. And I don't think where we're going, because, because we do not have a judgment on the ultimate merits of the disability claim. It is not the case that where we're going is that cities can't do exactly what the city did here. I don't want to give that impression. I think for purposes of this case, this court can assume that this policy did discriminate on the basis of disability. And so instead of treating some class of people with disabilities more favorably, I would just ask this court to assume that it cut the benefits of people with disabilities and left them worse off. Do you see many claims like this under other discrimination laws? Why or why not? Yeah, we do. I mean, this court has seen cases about post-retirement benefits in the Title VII context. There have been cases that have come to this court about sex and race discrimination in post-retirement benefits. And I think that's one of the anomalies of the city's position, is that whereas Congress is trying to bridge the gap between the legal remedies available for people with disabilities vis-a-vis people who are discriminated based on race or sex or other things in Title VII, the city's approach would broaden that gap. And is the way, again, you haven't taken a position on a lot of this, but is the fundamental way you understand these claims to work the same across discrimination statutes? You know, often, as Justice Alito points out, the ADA is kind of different. Would it be just the same here? I think in terms of a disparate treatment claim, it would be the same. I think it's an open question that we haven't addressed in our brief, whether something like a reasonable accommodation claim would provide a different kind of preferential treatment to people with disabilities in this context. It's not the same, because in a Title VII case based on race, sex, whatever, you're asking, are two people treated differently? People of different races, are they treated differently? People of different sexes, are they treated differently? Under the ADA, that's not what you ask in most cases, because what the plaintiff wants is not exactly equal treatment. That's the whole point. The plaintiff wants a reasonable accommodation. You take away, so if what you're saying is that, so I don't see how whatever has been done under Title VII sheds light into the problem here. I think the main difference between the ADA and Title VII is that, I'm sorry, yes, the ADA and Title VII, is that the ADA offers plaintiffs a reasonable, may I say, a reasonable accommodation claim, but under both statutes, plaintiffs can bring disparate treatment claims, and to just give an example of some disparate treatment that could happen here, imagine if there were policies, everyone who has 20 years of service gets a certain amount of benefits, except people with disabilities. I think that's a clear disparate treatment problem. Thank you. Justice Thomas, in order to further this. Justice Sotomayor. I'm understanding your response right. There are various kinds of claims under the ADA. Reasonable accommodation is one, but there's also disparate treatment.  And this is what's being claimed here. Do you think that this is slightly different case also because they had been extending a benefit that they then took away? I think that goes to an animus-based claim. I think if petitioner could show that the decision to reduce benefits was made out of animus, then that might allow them to satisfy the elements of a disparate treatment claim, even without pointing to the sort of formal disparate, the formal comparative. But there's still, and he mentioned one defense is that it's based on at risk factors, which are a different thing, correct? Or certain. Right. And then there's also a safe harbor in section 12, 112 C that provides a safe harbor for certain insurance underwriting plans. Do you have a different answer than Mr. Gupta as to the questions of why the other statutes that are pointed to by the other side are not effective remedies or substitutes for the ADA? I don't have a different answer. I would just boil it down to this, which is those other sources of law may well be useful in enforcing promises that an employer makes, but the problem here, the alleged problem here is that the employer made one promise to people without disabilities and a different worse promise to people with disabilities and simply enforcing that other less good promise isn't going to remedy the alleged discrimination in the complaint. Thank you, Chris. This is Kate. So, Mr. Liu, I just want to make sure that I understand what you would like us to do. And as I understand it, it's because Ms. Stanley was employed, was holding a job for a period of time that you would like us to go off on that basis. And you say, you know, she sued within the 300 days. And the consequence of that is that we never have to reach this qualified individual provision. Is that correct? I think because everyone agrees she was a qualified individual during that time. So, we never have to figure out what the qualified individual provision means with respect to somebody who's retired, not in a job. And, you know, whether we should think of that as precluding a suit for some later person. And you talked about why you shouldn't think of these as forfeited. I mean, it's at least true that the courts below did not address these. And I'm not sure that we had it in our minds when we took the case that this was the issue. So, what, if anything, would you say to that? I would say that the issue defined at the right level, and I'm defining it as the text of the statute defines it, is whether there was discrimination against the qualified individual. I do understand the court to have granted cert on that question. Then it's just a matter of the fact that these arguments, while they were pressed below, not only by us, but by Stanley, weren't addressed below. But I've always understood that pressed or passed upon a requirement to apply to issues and not arguments, but also to be phrased in the injunctive, such that if you did want to apply that test to the precise arguments here, it would be satisfied because these arguments were pressed below. Thank you. Justice Gorsuch, Justice Kavanaugh. I thought we were deciding whether the 11th Circuit's understanding of the law was correct, given the arguments that it considered. Is that not what we, you don't think that's what we should do? I think the 11th Circuit found various ways to reject the arguments that go to the overarching issue. Some of those ways of rejecting those arguments did involve addressing those arguments on the merits, and others involved determining that they were forfeited. But I think all of that is before this Court. Okay. Justice Barrett, Justice Jackson. So, I just wanted to clarify the conversation that you had with Justice Alito about whether the elements of disparate treatment have been plausibly alleged here. You don't consider that to be within the question presented in this case? We do not. So, it's more like whether or not her status as a former employee precludes her from making this claim. I mean, I thought at the bottom of all of this, we're talking about a motion to dismiss in which the city claimed that she was not allowed to go forward because she was a former employee.  And you're saying she is because there's evidence that she was discriminated against. Evidence, whether it's proven or not, evidence that she was discriminated against during the period of her employment, and that should be enough to allow for her case to go forward. That should be enough. We think even if she couldn't have pointed to that existence of discrimination while she was employed, that she would still have a claim like many others do in other situations where they cannot point to a precise moment in time in which they were both qualified and disabled. But I'll acknowledge that those are trickier issues, and this Court's usual practice is not to decide issues more broadly than it needs to. Thank you. Thank you, Counsel. Ms. Conner? Mr. Chief Justice, and may it please the Court. Title I of the ADA prohibits employers from discriminating on the basis of disability only against an individual who can perform the job she holds or desires present tense. This Court has explained in Robinson that use of present tense verbs is an unambiguous temporal qualifier, limiting a statute's reach to current employees only. Therefore, the 11th Circuit correctly held that because Stanley cannot establish that a city committed any discriminatory acts against her while she could perform the essential functions of a job that she held or desired to hold, her Title I claim failed. Indeed, the city's 24-month rule on its face is applicable only to unqualified individuals who retire because they are unable to perform their jobs. However, Petitioner argues that the city subjected her to its policy when she was a qualified individual during her employment, but a qualified individual is not subject to a policy that only applies to unqualified individuals, just like a man is not subject to a policy that applies only to women, and a non-disabled employee is not subject to a policy that only applies to disabled employees. This proposition is so well established that the Petitioner did not plead that the city's discriminated against her as a qualified individual. Instead, the District Court at 26A held that her Title I claim failed because her complaint alleged that the discrimination did not occur until plaintiff was no longer able to perform the essential functions of her job. This ruling should not be controversial. Everyone agrees, for example, that an employer does not violate Title I when it fires an employee who can no longer perform the essential functions of their job. The outcome should be no different here simply because retirees or post-employment benefits are involved. This Court should affirm. I welcome the Court's question. Would you spend a bit of time on what you think we granted cert on and what was decided below and what was not decided below? Yes, Your Honor. The Court certainly, I would assume, granted cert to hear the question. That is actually splitting the circuit courts. And that question is solely whether or not discrimination occurring totally and entirely post-employment against an unqualified individual is actionable under Title I. And additionally, this Court could consider whether or not discrimination occurring during employment is actionable. But the problem here is that the Eleventh Circuit never said that employees who are qualified during their employment who are subject to discrimination regarding post-employment benefits cannot sue. It did not say that. It just said that the petitioner disclaimed that argument, that she did not raise the argument that anything happened to her during her employment that was actionable. And the Eleventh Circuit also did not say that an employee must be qualified at the time of a lawsuit. The Eleventh Circuit said only that an employee must be qualified at the time of the discriminatory act. But because she alleged and also argued that the discrimination only occurred post-employment when she was totally disabled and unable to perform the essential functions of her job, that she alleged discrimination against an unqualified person only. Well, I take your point, Ms. Connery, that the Eleventh Circuit did not address this. But Mr. Gupta and Mr. Liu have suggested that Ms. Stanley did point it out on various occasions that she was not somebody who it was all post-retirement, but in fact that there were a couple of years of her employment where she had the exact same claim. And it seems a little bit odd to decide this bigger, broader question that you would like us to decide when, as to this particular person, it's academic. Justice Kagan, I heard my friends point to paragraph 16 of her complaint as where they claim she alleged discrimination during employment, but paragraph 16 actually does not contain any allegations. That would be in document one of the record at paragraph 16. I mean, I guess another way of stating the question is we would be deciding the question as if there were a set of facts that are not true. Correct. I mean, do you dispute that she was disabled before she retired? Do you dispute that? No, we do not dispute that she was disabled. But we dispute that any discrimination occurred while she was a qualified individual with a disability, because she became completely unqualified, meaning unable to perform the essential functions of her job, and then she took a disability retirement, and then the city applied its 24-month rule to her. So the only time that the alleged discrimination occurred was when she was an unqualified individual after she had taken her retirement. So under that view, a person cannot sue for retirement-related benefits discrimination, because it seems to me that you're saying that if a person becomes disabled while they are still employed, to the extent that the policy has not yet been applied, the policy concerning their retirement benefits, because they're still employed, they can't sue about it, and then when they retire and the policy is applied, they can't sue about it because they've become unqualified at that point, in your view. So how do you ever challenge discrimination concerning a policy that relates to retirement benefits and disability? Justice Jackson, neither the city nor the 11th Circuit said that a qualified individual could never sue over discrimination in post-employment benefits. The 11th Circuit, in fact, acknowledged that that is a possible scenario. There is a possibility that somebody who is qualified, if they become subject to the policy during their employment- Can you help me understand why the qualified individual designation in the statute has anything to do with this? My instinct is sort of closer to Justice Alito's in terms of qualified individual coming up in the reasonable accommodations context. This is not that context. So I don't even understand the work that it is doing with respect to setting some sort of temporal limit as to whether or not this person can sue for retirement benefits. So I didn't- It's because the language in the anti-discrimination provision expressly draws a line as to who is protecting. It says, no employer shall discriminate against a person who can perform the job they hold or desire, and no other person is protected. You're only prohibited from discriminating against a person who presently holds a job that they desire. Okay, and she says, at the time that I held the job, I became disabled and that policy applied to me. I was subject to it in that period of time. So as Justice Kagan says, why would we pretend as though that is not a fact in the case, not hear and decide this on a broader question that relates to people who did not hold the job during the time that they were qualified? Because the policy that she describes, that she claims is discriminatory and she describes in her complaint, on its face only applies to a person who becomes completely unable to perform their job and is therefore unqualified. So it would be the same if the city had a policy that said, if you become completely unqualified and unable to perform the essential functions of your job, we will terminate your employment. And that is perfectly, that is not unlawful under the ADA. But what she's claiming is, if you wrote down something that is lawful, that is not controversial at all, that if you become unable to perform your job, we can terminate you because you're no longer a qualified individual. But she's saying, I could sue to prevent you from doing something to an unqualified individual that the ADA does not prohibit. She's claiming that the 24-month rule only applies to a disability retiree. And a disability retiree is not just somebody with a disability. It is defined as somebody who is permanently and completely unable to do the job. That's why she was awarded a disability retirement, because she became an unqualified individual. And only those who take the disability retirement. If she had been non-disabled and retired with the 20 years that she had served, she would have received no health insurance subsidy whatsoever. The city made an exception because of her disability, out of compassion that even though everybody else who only serves for 20 years only receives no health insurance subsidy, out of compassion for those who retire because they are completely disabled and unable to do the job, we will give 24 months of the health insurance subsidy. So I understand that argument, but doesn't that just go to the merits of her disability claim? Is she stating, this is Justice Alito's point, a claim for disability, or excuse me, for discrimination. You've raised the objection, an objection that has something to do with the fact that she's post-retirement. And that's what's confusing to me. It's because when she was post-retirement, she was an unqualified individual. She was totally disabled and unable to perform the essential functions of her job, which takes you outside of the protections of Title I, because Title I only prohibits discrimination against a person who can perform a job they presently hold or desire. So someone who neither holds a job, desires a job, and is completely unable to perform the job, does not fall under the protections. Title VII? Title VII does not use the phrase qualified individuals. It refers broadly to individuals or employees, which is why in Robinson, this court said that under Title VII, the use of the word employees in the anti-discrimination provision of Title VII was ambiguous because employees was defined as a person employed, past tense. And that could be ambiguous, is employed or was employed. And so under Title VII, which does not refer to qualified individuals, there was an ambiguity in the use of the word employees. But that is why Congress did not simply amend Title VII to add disability as a protected trait, because disability is very different, and the ADA structure is very different from Title VII. They share the same remedies, but they do not share the same substance. Counsel, as I'm hearing your answer to Justice Jackson, you are taking the far extreme position that the SG is not, but that at least two circuits have, that a retiree has no entitlement because at the moment they're retired, they lose, they're no longer qualified, correct? It's because at the time of the discriminatory act that they allege they're no longer qualified. I'm not sure. That's because you're saying that at the moment that the policy is changed, regardless of when it's changed, they're no longer qualified? It's depending upon what a particular plaintiff alleges. If they're relying on an adverse employment action, that is taken solely against an unqualified individual. So are you fighting that if she had properly alleged that she had Parkinson's two years before she retired, that she would be entitled to sue? If she had alleged that the city had a policy that said, if you have Parkinson's disease, we're not going to pay you a pension, she would have been subject to that policy during her employment as soon as she got Parkinson's. You're trying to qualify in the ways you're not. You're basically saying if you're retired, you're not entitled to anything, even if you have been made this promise during your time of employment, because you're saying the promise here she relies on and it's specified in her paragraph 19 was, if we will pay you equally to people who work 25 years or to people whose 25 years encompasses service in the military or in other governments, and she's saying in whatever year it was, 2010, we're going to change that policy. If she's relying on the discriminatory, as the alleged discriminatory act when we changed the policy in 2003, she would not have been a qualified individual with a disability at that time. And she was in 2018 when she developed Parkinson's. In 2018, she certainly had a disability. She was not a qualified individual. Why was she not a qualified individual in 2018? Well, in November of 2018 is when she took her retirement because she became an unqualified individual, meaning somebody totally disabled. Was she qualified at the point at which she got the Parkinson's? 2016. She would have been a qualified individual at that time, but the policy did not apply to qualified individuals with disabilities. The policy would only be applied to somebody who became unqualified because you have to take a disability retirement, which means you are unable to perform the essential functions of your job. At that point, the 24-month subsidy policy would apply to her, and she's no longer qualified at the time the 24-month rule was applied to her. And that's no different from an employer terminating the employment of somebody. They have a disability, but then they become totally disabled. You can terminate their employment because they're unqualified at that point. And there's nothing controversial about that. It's only made controversial because, for some reason, they're arguing for an exception to the plain language just for retirees. But there should be no exception. The language contains no exception. There is a very clear line drawn by Congress to protect only those who can perform the jobs they hold or desire. And again, it's about when the discrimination occurs. Nobody is arguing, and the 11th Circuit certainly did not hold that she was required to be a qualified individual at the time of her lawsuit. She was required to allege that at the time she was discriminated against, she was a qualified individual with a disability, and she is not able to allege, did not allege, and, in fact, disclaimed any argument that she was a qualified individual. I just want to make sure I understand what you're saying, because there is this two-year period where she's a qualified individual, right? She has Parkinson's, but she's able to hold a job, and you don't dispute that.  And she's a qualified individual when the city adopts its policy. That's correct, right? You don't dispute that. And she's a qualified individual when she's earning her retirement benefits. You don't dispute that. No, she would not be a qualified individual when she's earning the retirement benefits. Earning, as opposed to receiving them, right? Like, you know, an employee earns retirement benefits by doing the job. We would only dispute as a factual matter that she earned these benefits because she did not satisfy the criteria to earn them, which was 25 years of service. I mean, she's just, I guess what, maybe that answered my question. I'm not sure. I mean, all I was suggesting was that she's a qualified individual doing the job, just like other people are qualified individuals doing the job, such that she's putting herself in line for a package of retirement benefits, correct? And the city has passed this policy at the time that she's a qualified individual. But you're saying that because the policy addresses the retirement period, all of a sudden then she's not a qualified individual. No, the argument is just slightly more nuanced. It's the fact that this particular policy only applies to unqualified individuals. So what she's saying is discriminatory is the fact that she only received the health insurance subsidy for 24 months after she retired. And those who had 25 years of service received the health insurance subsidy to age 65. So you're not saying that any retirement policy only applies to unqualified individuals. You're saying this particular retirement policy only applies to unqualified individuals. And I'm sorry for being dense, but tell me why. So this policy, what she's complaining about is that she only received 24 months of the subsidy instead of receiving it to age 65, like 25-year retirees receive. So she's arguing that when we applied the 24-month rule to her and stopped paying at 24 months, that was the discriminatory act. And that was when she was unqualified. And the 24-month rule only applies to disability retirees. And that has a very specific meaning. A disability retiree is not just somebody who has a disability and retires. A disability retirement is awarded to people who become completely unable to perform the essential functions of their job. And because of that reason, they take a disability retirement. They retire early. So the 24-month subsidy policy only applies to those totally disabled. And they would only become subject to it once they become totally disabled and accept a disability retirement, which is what she did. If she had not taken a disability retirement, if she had continued to work for 25 years, she would have received the full subsidy despite having a disability. So the policy only applied to her, the 24-month rule, because she retired early with a disability that rendered her an unqualified individual, and then the city applied the 24-month rule to her. Well, let's say six months before she retired, she says, look, I've got Parkinson's. It's getting progressively worse. I can still do the job now, but I can see that I'm not going to be able to do the job for very much longer. And I look ahead to what's going to happen after I retire, and I'm going to be subjected to this retirement structure that gives me only 24 months. And I think that's discriminatory. Putting aside the question of whether that's a valid claim under the ADA, why could she not sue at that point? Because she would be seeking to enjoin conduct that is not unlawful under the ADA, because she would be seeking the employer to not do something to an unqualified individual, which it otherwise would not be prohibited by the ADA from doing. It might be prohibited under another statute. It would be no different. She claims she's qualified at that point, and she claims it's doing something to her at that point. So is she not aggrieved? Does she not have Article III standing because there's an imminent threat of what she claims is unlawful conduct in the future? No, it would be no different if she knew that her disease would render her totally disabled, and she wanted to enjoin the city from terminating her employment before it did so. When, of course, under Title I, employers are allowed to terminate employees the moment they become unqualified and they can't do the job with or without a reasonable accommodation. She would be seeking to enjoin the city from doing something that is not unlawful under the ADA. It might be an equal protection violation. It might be a breach of contract. It might be all of these other things. But it would not be a violation of Title I of the ADA. Given her allegations, do you think she has a basically valid breach of contract claim? Absolutely not. There is no breach of contract because the policy was changed in 2003, 15 years before she retired. And under Florida law, governmental employees are permitted to change retirement policies before the rights under them vest. So we would not have been allowed to change it after she retired. She would have had a vested right. But 15 years before she retired, we changed the policy to not treat her worse, but to treat her slightly less preferentially than she was already receiving. Before the policy change, disability retirees, even if they retired with five or ten years, were given the same health insurance subsidy as people who worked for 25 years. So they were receiving preferential treatment over similarly situated non-disabled employees who had the same amount of years. And then the city changed it to start treating disability retirees more equally with everyone else and said, now you also have to work 25 years to get the full subsidy, but out of compassion because you are forced to retire due to a disability, we will give you 24 months of subsidy, whereas we would otherwise give you nothing if you were a non-disabled person. And uncoincidentally, 24 months is exactly how long it takes for a totally disabled person to then become Medicare eligible and get Medicare insurance. So the city bridged that gap between when a disability retiree retires early and the two years that it would take to start getting health insurance under Medicare. Can you explain the Medicare insurance and how that works? So after the two years, someone in this position gets the health insurance benefits that you're giving them for the two years in the interim, correct? Or it's similar? I don't know how Medicare matches up with your health insurance benefits. So a person like the petitioner who alleges they are totally disabled could qualify under Social Security disability and the Medicare Act says once you become eligible for Social Security disability because you're permanently disabled, you then become eligible for Medicare parts A and B. So that bridges that gap. We paid, the city paid for her health insurance until those 24 months. I'm sorry to interrupt. I think you were saying the city did that precisely to bridge that gap so that someone who's totally disabled is not left without health insurance. I'm not sure the because here, but that's what you're representing, I think, to bridge the gap so that someone's not left without health insurance in the two years. Because if a non-disabled person were in petitioner's shoes and retired with only 20 years, they would receive absolutely no health insurance subsidy. And they also, because they're not disabled or totally disabled, would not be Medicare eligible if they weren't 65. So the city continued to treat its disability retirees with preferential treatment over non-disabled employees who are similarly situated with an equivalent amount of years of service. The problem with this argument, in my mind, is who bears the cost? You're saying the public fists should bear the cost because in two years, Medicare will pay what we used to pay, correct? Because under the Medicare Act, they exhaust private remedies first, and then the public fist pays. Well, there is no requirement that any employer provide health insurance subsidy. We're putting aside. That's the nature of the claim here, which is you promised me you would. And assuming that were true, which I know you fight on every level, but assuming you made an explicit promise, I'm going to pay you this amount of money, and then took it away so the public fist could pick it up, that's what you're doing, is you're saying we're, this is just always a matter of who's going to pay, us or the public. If the city had actually promised her this benefit and she had a vested right, she would have a very clear breach of contract claim and the city would be liable. You're trying to avoid my question. In that situation, then the issue becomes who pays, you or the public? But somebody has to pay, right? Certainly, she would have a variety of remedies. You hope. She would likely have a very strong case against the city. Isn't your argument just basically that this isn't discriminatory when we took the case to say, assuming there was an allegation of discrimination, when did that occur from the standpoint of whether or not she can maintain this action? That's the thing. I'm worried that we're getting sidetracked into the merits of whether she was actually discriminated against, whether this policy is a discriminatory policy, when really the question is just, is her former status precluding her from continuing this action? Or has she alleged, you know, right? So if we assume the city's policy is discriminatory, if we were, if you're the We're just going to accept that premise. Yes. It still was not a discriminatory policy that she became subject to during her employment as a qualified individual with a disability because the policy only applies to unqualified individuals, those who become totally disabled. Right. But you're saying it applies to people, they become totally disabled and they're unqualified because they can't work anymore. So you're essentially saying that if it's about retirement benefits and you no longer are working and you're complaining about that, you're unqualified and therefore can't bring this action, right? Right. But I think there could be a scenario where a qualified individual with a disability could sue with regard to discrimination and post-employment benefits if they meet the criteria. So if there was a policy that said the criteria, they're working, then they're no longer a former employee. The criteria, the discriminatory policy, who does it apply to? So that's why we think that a policy that applies only to women, a man cannot sue. He cannot say that I am subject to a policy that discriminates against women. But why are you saying that this policy does not apply to, or it only applies to unqualified? I, when you say that, I hear you're saying it only applies to people who are still in the job or who aren't in the job anymore. Who aren't in the job anymore, right? The qualified individual is also somebody who can perform a job they hold. So you also have to be able to perform it. But if you are totally disabled and cannot perform the essential functions of the job, and that's why you retire, you are not a qualified individual because you cannot perform a job that you hold or desire and employ. What Jackson was suggesting and maybe what I was suggesting not so clearly before was that all retirees are not qualified individuals looked at at the time that they're retirees because whether or not they could perform the job, they don't want to perform the job. They've retired. So any retiree is going to be not a qualified individual at the time that they're a retiree. So that would, so that would suggest that what you're saying is there's just no such thing as being able to sue in the time when I still am working about a retirement benefit that's going to kick in when I'm no longer working. So I think there is a scenario where a qualified individual with a disability could be, it could be subjected to a discriminatory policy regarding post-employment benefits. So while she was working, while the petitioner was working and developed a disability, the city had a policy that said if you develop a disability, we will not pay you a pension. And she was qualified at the time that we adopted that policy. She would be subject to a policy that says no disabled person gets a pension because she has a disability and now she is subject to that policy now as a qualified individual. The difference is our policy is not no disabled person gets a pension. It's a policy that applies only to people who become unable to do the job because they're totally disabled. But if she, if it really truly were discriminatory in that it said, even if you get a disability, we're not, and you work for 25 years, we're not going to give it to you, then she could have sued over that. Thank you, counsel. Justice Thomas, I'm sorry, anything further? This might be more merits, but I'm interested on who would pay the question on Medicare. It's the federal public as opposed to if it's the city, it's the either the city's taxpayers or the maybe the state of Florida. I don't know how that works, but it's one set of the public versus another set of the public. That's correct, Your Honor. All right. This is Jackson. Thank you, counsel. Rebuttal, Mr. Gupta. Thank you. Just a few quick points. First, I don't think you heard a persuasive answer to why the court shouldn't resolve this case on the narrow theory. We agree with the United States. That's the most straightforward way to do it. And I think the colloquy with Justice Kagan and Justice Alito shows that it's the case that it's indisputable that she was a qualified individual subject to an allegedly discriminatory policy that reduced her compensation. The ADA allows her to challenge that policy even after she leaves the job. And that answers the question and resolves at least a chunk of the circuit split. But the second point I want to make is I think while the case can be resolved on that narrow ground, I do want to urge the court in its opinion to be careful not to foreclose other scenarios that the city's reading would permit, particularly given the city's failure to identify any plausible reason why Congress would have wanted to draw this arbitrary line. A firefighter who becomes disabled saving people from a burning building could be discriminated against the next month. A retired firefighter who develops a respiratory condition from years of smoke exposure could lose health coverage. And an employer could deny privileges that are extended to all other former employees such as use of the company cafeteria or the attendance at a company retreat based solely on disability-based animus. And the third and final point I want to make is just on the broader question, the city's position creates fundamental anomalies that Congress couldn't have intended. The city concedes that the ADA protects retirement benefits but offers no coherent account of how that protection could be vindicated as I think the questions with Justice Jackson showed, the city's extreme position creates perverse incentives for employers to hide discrimination until after retirement and it would transform clearly unlawful discrimination into perfectly lawful conduct based solely on timing, even though Congress expressly protected these benefits and included a safe harbor provision to address legitimate cost concerns. For race or religion, we would never tolerate a regime under which unlawful discrimination suddenly becomes lawful a minute later. The city can't explain why Congress would have created such an arbitrary line for disability discrimination alone. Thank you. Thank you, counsel. The case is submitted.